UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:12-CV-00014-JHM

CHERYL LEWIS-SMITH                                                    PLAINTIFF

V.

WESTERN KENTUCKY UNIVERSITY                                          DEFENDANT

<u>Memorandum Opinion and Order</u>

This matter is before the Court on Defendant Western Kentucky University's ("WKU")
Motion for Summary Judgment [DN 55].  Fully briefed, this matter is ripe for decision.  For the
following reasons, the Motion for Summary Judgment is GRANTED.

### I. Background

Plaintiff Cheryl Lewis-Smith, an African-American, was first hired at WKU in March
1997, by Tony Glisson ("Glisson"), Director of WKU's Human Resources ("HR") Department.
Plaintiff was hired into the position of "Compensation Manager" and, along with two other HR
managers, reported directly to Glisson.  Less than one year later, Plaintiff resigned from WKU in
order to accept a new job at a local hospital.   Glisson accepted Plaintiff's resignation by
expressing appreciation for her "enthusiasm, attitude, cooperative spirit and work ethic."
(Lewis-Smith Dep. Ex. 6 [DN 47] 118.)  During her brief initial tenure at WKU, Plaintiff got
along well with Glisson and her other colleagues in HR and "had no problems."  (<u>Id.</u> at 42:4–
:14.)  Plaintiff's new job at the hospital was a promotion in terms of salary and supervisory
responsibility; she was to manage three employees and her salary increased to $40,000 versus the
$33,000 she was earning at WKU.  (<u>Id.</u> at 44:6–:17, 46:17–:20; Ex. 3, at 109.)  However, in
2003, the hospital underwent a restructuring and Plaintiff was demoted.  (<u>Id.</u> at 47:25–48:11,

49:2–:6.)  Her salary was reduced at that time from roughly $60,000 to less than $55,000, and she no longer had any direct reports.  (Id. at 48:12–:15, 50:14–:25, 51:1–:3.)

In early June 2004, a long-time HR employee retired from WKU, and the University created a new position titled "Manager of Employment and Training" with responsibility for the coordination of employee recruitment and selection, and for staff training activities.  (See id. Ex. 7, at 120–23.)  Glisson received approval from his boss, Vice President Gene Tice ("Tice"), to realign duties among the three HR manager positions and to shift responsibilities and salary from the vacant position to the other two HR managers then working under Glisson, Maribeth McBride ("McBride") and Patty Booth ("Booth").  This decision was made prior to advertising the job opening for the new position of "Manager of Employment and Training."  The new position was approved for advertisement at a range of $42,000 to $45,000.  (Glisson Dep. Ex. 4 [DN 48] 207.)

Plaintiff applied for the position on June 29, 2004.  Glisson explained to Plaintiff during her interview that McBride and Booth had assumed some new tasks from the retiring manager and that Glisson had promised to "take care of" Booth and McBride.  (Lewis-Smith Dep. [DN 47] 66:12–:25, 68:10–:24.)   Glisson also told Plaintiff that the advertised salary was the maximum budgeted for the position and that WKU could not pay more than $45,000.  (Id. at 73:17–74:5; Glisson Dep. [DN 48] 62:22–63:5.)  Glisson testified that he thoroughly discussed the initial salary with Plaintiff because he was aware that she would be taking a pay cut to return to WKU and did not want to get into a salary issue later on.  (Id.)  On July 30, 2004, Glisson offered the position to Plaintiff at the beginning salary of $45,000.  Plaintiff accepted and her first day of work was September 13, 2004.

Within three months, however, Plaintiff went to Glisson with a salary complaint. (Lewis-Smith Dep. [DN 47] 81:19–:23.) Plaintiff related that she had seen a salary-change approval form and realized that part of the original budgeted salary for the Manager of Employment and Training position had been reallocated to the other two HR managers before she was hired. She indicated that, after becoming aware of the credentials of those two managers, she felt she was being paid unfairly. (Id. Ex. 10, at 131.) Plaintiff testified that if she had known budgeted funds were shifted to the other two manager positions from the position she later accepted, she never would have accepted the job at WKU. (Id. at 94:19–96:23, 106:20–108:12.) According to Plaintiff, Glisson was very offended when she came to him with her salary concern because she had accepted the job knowing the salary was $45,000. (Id. at 80:9–81:18.) According to Glisson's meeting notes from December 15, 2004, which Plaintiff does not dispute, Glisson shared his disappointment with her over what she characterized as an "ethical issue" because they had discussed the salary limitations during multiple conversations just three months before. (Id. Ex. 10, at 131.) Glisson suggested Plaintiff share her concerns with Tice, who was aware of the salary issues and recent changes, which Plaintiff did.

Plaintiff initially met with Tice to discuss her salary complaint and then met with both Tice and Glisson in early January 2005. Tice declined to grant Plaintiff a raise at that time and explained that the realignment had been approved and implemented prior to any advertisement of the Manager of Employment and Training position and that Plaintiff had accepted employment at the salary of $45,000 per year. (Id. Ex. 13, at 138–39.) Plaintiff conceded that the salary dispute had nothing to do with her age or race, but that it impacted her relationship with Glisson, who she testified became very abrupt and hostile towards her. (Id. at 108:3–109:25.) Thereafter,

in June 2005, Plaintiff received a $2000 raise,[1] although she expressed her continued unhappiness with her compensation and indicated to Glisson that she would explore other employment options.  (Id. Ex. 15, at 145.)  Glisson responded that if she was unhappy she should seek another job.

The relationship between Glisson and Plaintiff further worsened after Plaintiff raised a second concern in September 2005, regarding her application for WKU's Director of Career Services position.  Specifically, Plaintiff was concerned that she was not interviewed for that position, which she believed was a "human resources type of position."[2]  (Id. at 157:17–160:7.)  Plaintiff discussed her concern with Glisson, including what Glisson understood to be an accusation that he had interfered with her application.  (Id. at 161:16–162:14.)  Glisson subsequently sent Plaintiff a memorandum expressing his concern that she believed he had acted inappropriately to harm her and assuring her that he was committed to supporting her career goals.  (See id. Ex. 18, at 154–55.)  Plaintiff replied that she had not accused Glisson of anything and characterized Glisson's response as "enraged"; Glisson believed he had merely explained that the Career Services job required a background in student affairs, not human resources.  Plaintiff also discussed her concerns with EEO Director Huda Melky ("Melky").  Melky's office conducted an audit of the Director of Career Services position search and found no evidence of discrimination against minority applicants or of any outside influence on the search committee as alleged by Plaintiff.  (Id. Ex. 17, at 152.)  Melky, as well as Assistant EEO Director Joshua Hayes, testified that Glisson was the specific "outside influence" mentioned by Plaintiff as

---

[1] After 2005, Plaintiff received yearly raises through the 2009–2010 fiscal year, when she was paid $54,000. (Lewis-Smith Dep. Ex. 16 [DN 47] 147–50.)
[2] Various other witnesses testified that Career Services and Human Resources are two entirely different disciplines and that Plaintiff was not qualified for the Director of Career Services position.  (See Glisson Dep. [DN 48] 170:12–171:6; Melky Dep. [DN 49] 107:22–108:6; Hayes Dep. [DN 50] 12:15–13:25.)

having interfered with her candidacy.  (Melky Dep. [DN 49] 105:7–:18; Hayes Dep. [DN 50] 14:1–:20.)

The next point of conflict between Plaintiff and Glisson occurred in early 2007, regarding Plaintiff's 2006 evaluation prepared by Glisson.   Although the evaluation fell within the "satisfactory" category, the numerical score (96) was significantly lower than the previous years.  (Lewis-Smith Dep. Ex. 27 [DN 47] 181–86.)  Glisson's comments regarding Plaintiff's strengths and weaknesses included:

> Certain aspects of Cheryl's responsibilities she does very well; other aspects are accomplished at less than optimal levels.  Cheryl does have a good understanding of general human resources concepts and practices.   Cheryl sometimes has difficulty in understanding things from a "University" perspective.   Sometimes Cheryl comes across as seeking self-praise rather than the "common good" and this limits her effectiveness with HR staff and others. . . .   While Cheryl has a general knowledge of human resources practices, she has not been able to contribute and demonstrate the leadership necessary to gain the unqualified confidence of others within Human Resources.

 (Id. Ex. 27, at 183.)  Glisson met with Plaintiff in early February 2007 and shared with her that other staff members did not feel she was pulling her weight and that she was not viewed as a contributing team member.   (Id. at 185:20–186:12, 186:18–:21.)   Glisson also discussed additional issues that were not specifically listed in the written evaluation, such as not knowing the details of WKU's employment process, tardiness, and excessive time out of the office.  (Id. at 191:20–193:6; Ex. 25, at 177.)  Plaintiff testified that she was shocked by Glisson's comments and sought immediate treatment for high-blood pressure.  (Id. at 195:9–:19.)  She was so upset by the evaluation that she missed several days from work.  Plaintiff testified that when she met with Glisson ten days later to discuss the review, he became frustrated and ended the meeting abruptly.  (Id. at 202:3–203:21.)  Glisson told her that she could appeal the evaluation to Tice, which she did.  (Id. Ex. 28, at 188–90.)

In her appeal to Tice, Plaintiff indicated that Glisson had told her that he had never gotten over the initial salary dispute from 2004. She further claimed that Glisson said that she was just an average performer compared to the other two managers whom Glisson referred to as "superstars." (Id. at 204:9–205:6.) Glisson testified that Plaintiff's evaluations were always much lower than his evaluations of the other two HR managers. (Glisson Dep. [DN 48] 172:5–:12.) Additionally, Glisson stated that Plaintiff had not produced any tangible results for the year and that he believed the best thing for her to do was to find another job. (Lewis-Smith Dep. [DN 47] 204:9–205:14; Ex. 28, at 188–90.) Tice met with Plaintiff and pointed out that Glisson's criticisms in the evaluation were consistent with Glisson's comments from the two previous years, but suggested periodic review of progress towards goals during the year. (Id. Ex. 29, at 192–94.) Tice concluded that the evaluation did not need to be changed. (Id.)

In early December 2009, Plaintiff contacted EEO Director Melky after learning that Booth, another HR manager, had received a raise earlier in the year. (Melky Dep. [DN 49] 103:5–:10.) Plaintiff was upset that Glisson had removed her from the electronic routing of the approval of Booth's raise. Plaintiff testified that she believed she had been discriminated against because the department had been told that no one in the department would be given a raise. (Lewis-Smith Dep. [DN 47] 118:10–:19.) While meeting with Plaintiff, Melky asked WKU General Counsel Deborah Wilkins ("Wilkins") to join the conversation. (Id. at 118:20–:21.) Wilkins was aware that Booth had received a raise for added job duties and suggested that Plaintiff address the salary adjustment issue with Vice President Ann Mead ("Mead"), who had replaced Tice as Glisson's boss, which Plaintiff did. (Id. at 118:21–:25, 119:6–:9.)

Plaintiff met with Mead sometime soon thereafter. Plaintiff testified that she asked Mead for a salary adjustment at that time and that she told Mead she "had concerns based on certain

things."  (Id. at 123:9–125:1.)  Plaintiff testified that she discussed with Mead her working relationship with Glisson, her feeling that she was excluded from activities and processes, and that she was treated unfairly.  (Id. at 124:4–:22.)  Mead asked Plaintiff during that meeting whether or not she wanted to file a formal complaint about any kind of hostile work environment or racial discrimination.  (Id. at 125:2–129:23.)  It is not clear from Plaintiff's testimony exactly what her response was, however it is clear that Plaintiff did not file a complaint at that time (or at any other time thereafter).  (See id. at 123:9–125:1.)  Mead reviewed Plaintiff's salary adjustment request and performed an analysis of the new job duties identified by Plaintiff.  Mead concluded that any added tasks were either minimal or fell within Plaintiff's job description and denied the requested raise in a letter dated December 18, 2009.  (See id. Ex. 35, at 219–23.) According to Plaintiff, Glisson "blasted" her when he found out she had gone to Mead regarding the salary issue, told her he was tired of Plaintiff going over his head, and said that if she was unhappy in her job she would leave.  (Id. at 292:23–293:2.)

The Court notes that there is conflicting evidence in the record, including conflicting testimony by the Plaintiff in her deposition during discovery and her affidavit filed with her response brief, as to whether Plaintiff actually reported discrimination and/or a hostile work environment *based on race*, to either Melky or Mead.  It is undisputed that Plaintiff did not file a formal or informal complaint of racial discrimination or racial hostility with anyone at WKU, (Lewis-Smith Dep. [DN 47] 294:4–295:16; Melky Dep. [DN 49] 15:15–:23, 45:6–:9, 54:9–:18, 121:15–:18), and that Plaintiff expressly acknowledged that she knew how to make such a complaint if she had chosen to do so, (Lewis-Smith Dep. [DN 47] 114:10–:19, 214:11–:15). However, there is evidence in the record—a handwritten note and Plaintiff's own affidavit submitted with her response brief—that could support that Plaintiff complained about racial

discrimination and/or a hostile work environment.  The handwritten note, whose author appears to be Wilkins (see Melky Dep. [DN 49] 25:5–:7), states: "Discrimination based on race.  Hostile environment→wouldn't let her stuff envelopes.  Says TLG has gone over her head and approved EPAFs."  (See id. Ex. 2, at 130.) [3]  The document is dated December 7, 2009 and labeled at the top with "Cheryl Smith."  It also contains the names "Ann" and "Huda" in the upper left margin. Melky testified that what was verbally related to her by Plaintiff was not what was reflected in Wilkins' handwritten note.  (Id. at 25:9–:14.)  Melky further testified that Plaintiff did not say that she was being racially discriminated against or that she was working in a hostile working environment.  (Id. at 23:16–:21, 24:5–:9, 25:22–:24, 30:21–31:12.)  However, Plaintiff's affidavit states that she told Wilkins and Mead that she felt she was racially discriminated against and that she was working in a hostile work environment during their meeting on December 7, 2009. (Lewis-Smith Aff. [DN 75-1] ¶¶ 18, 20.)

Part of Plaintiff's job was to report discriminatory practices and ethical concerns to Glisson, her supervisor.  During her employment at WKU, Plaintiff was a University Staff Council Member, and was elected as Council Chairperson.  She served as Chair up until the time of her termination at WKU.  WKU Staff Council is a voluntary entity "whose purpose is to suggest, recommend, and review various policies, procedures, and programs having implications for staff employees.  The Staff Council reports its recommendations to the President of the University." (Melky Dep. Ex. 3 [DN 49] 135.)  The Staff Council was not authorized to receive or respond to complaints concerning "protected activities and/or discriminatory treatment in the workplace."  (Id.)  Through her position in the HR Department and as Chair of Staff Council,

---

[3] It is somewhat unclear who authored the note.  Plaintiff asserts in her brief that Huda Melky is the author of the document, (see Pl.'s Resp. [DN 75] 19, 21), but offers no proof to support that conclusory assertion.  Melky testified that she did not author the document.  (See Melky Dep. [DN 49] 24:14–:16, 46:22–:23.)

Plaintiff came into possession of information regarding various legal issues and employee concerns.

In 2009, WKU undertook to implement a new computer applicant tracking system for accepting and managing employment applications.  The contract was awarded to PeopleAdmin, and implementation steps began in the fall of 2009 with a goal of attaining full implementation by July 1, 2010.   An implementation committee, made up of individuals from HR, EEO/ADA/504 Compliance Office, Academic Affairs, and Administrative Systems and Applications, was established and charged with system implementation.  Glisson appointed Plaintiff and Booth as co-chairs of that committee; Plaintiff was to oversee the policy and applicant tracking aspects of the system and Booth was assigned to address the technical aspects of the program.  (Glisson Dep. [DN 48] 168:16–169:21.)  Glisson considered the project to be very important to WKU and the HR Department in particular.  (Id. at 26:21–27:3, 125:12–:13.)

On April 12, 2010, the EEO representative on the committee, Joshua Hayes, sent a group e-mail message that Plaintiff perceived as praising Booth but not Plaintiff.  (See id. Ex. 32, at 268–70; Hayes Dep. [DN 50] 21:20–23:8.)  When Plaintiff complained to Glisson about the perceived slight, she accused him of being "pompous" and "smug," which Glisson testified offended him.  (Glisson Dep. [DN 48] 167:14–:19; Ex. 32, at 268–70; Lewis-Smith Dep. [DN 47] 317:22–318:7.)  At that time, Glisson shared with Plaintiff that some implementation committee members had been critical of Plaintiff's contributions to the committee and that he had been evaluating how to address the concerns he had regarding her role as a leader of the project.  (Id. at 314:1–:3; Ex. 38, at 235–36; Glisson Dep. Ex. 32 [DN 48] 268–70.)  Glisson told Plaintiff that he would let her know soon what he decided to do.  (Id.)

The same day, Plaintiff also confronted Hayes, in what Hayes testified was an unprofessional manner.  (Hayes Dep. [DN 50] 25:10–27:2.)  Hayes related the confrontation to Melky, his boss, who in turn complained to Mead about work that the EEO staff had been required to perform because Plaintiff had not been doing her job.  (Id. at 28:19–29:10; Ex. 3, at 95–96; Melky Dep. [DN 49] 70:6–73:7.)  Glisson and Mead met later that week and Glisson recommended that Plaintiff's position be eliminated and her employment be terminated.  (Glisson Dep.  [DN 48]  22:16–:23,  23:16–:19,  123:20–124:7).    Mead  approved  that recommendation.  The following week, on April 19, 2010, Glisson and Mead met with Plaintiff to share the decision, which was also provided in the form of a letter advising her of the reorganization of the HR Department.  (Lewis-Smith Dep. Ex. 39 [DN 47] 239.)  Plaintiff was informed that her last day of work would be April 30, 2010, but that she would be paid for an additional two months—through June 30, 2010.  (Id. at 370:2–:4.)

On  January  27,  2012,  Plaintiff  filed  this  action  alleging  violations  of  the  Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–633a, the Kentucky Civil Rights Act ("KCRA"), KRS 344.040, and the Kentucky Whistleblower Act ("KWA"), KRS 61.101–.103, 61.990–.991, as well as a wrongful discharge claim.  (Compl. [DN 1] ¶¶ 22, 28, 36.)  Plaintiff subsequently amended the Complaint on July 10, 2013, to allege violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17, and the KCRA, KRS Chapter 344, based on race discrimination and retaliation.  (First Am. Compl. ¶¶ 1–6.)  On June 6, 2014, Defendant filed this Motion for Summary Judgment [DN 55].

## II. SUMMARY JUDGMENT STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

## III. DISCUSSION

Plaintiff alleges various claims against Defendant WKU: (1) race discrimination; (2) hostile work environment based on race discrimination; (3) retaliation for reporting discriminatory treatment; (4) violation of the Kentucky Whistleblower Act; (5) wrongful discharge; and (6) age discrimination.  The Court will address each claim in turn.

## A. Race Discrimination

The Court will first address Plaintiff's claim under Title VII, 42 U.S.C. § 2000e–2(a)(1), and the KCRA, KRS 344.040, for racial discrimination.  Courts interpret Title VII and the KCRA using the same standards.  Smith v. Leggett Wire Co., 220 F.3d 752, 758 (6th Cir. 2000) ("Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964 ("Title VII"), we use the federal standards for evaluating race discrimination claims.").  Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In disparate treatment cases, such as this one, the plaintiff must establish that the adverse employment action was motivated, in part, by the plaintiff's protected-group status.  Absent a discriminatory basis, an employer does not violate Title VII, even though the discharge may have been arbitrary, unfair, or for no reason at all.  See St. Mary's Ctr. v. Hicks, 509 U.S. 502, 514 (1993) ("We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated*.")

Where, as here, a plaintiff fails to present direct evidence of discrimination,[4] courts analyze Title VII disparate treatment claims under the three-step McDonnell Douglas framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Initially, the plaintiff must present evidence sufficient to establish a prima facie case of racial discrimination. Id.  Once a plaintiff establishes her prima facie burden, the burden of production shifts to the

---

[4] The Court only engages in the McDonnell Douglas burden shifting analysis where there is no credible, direct evidence of discriminatory intent.  No such evidence has been submitted and Plaintiff seemingly agrees that this case should be governed by McDonnell Douglas.

employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. Id. at 803.  If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason is pretext for unlawful discrimination—that is, "that the [employer's proffered] reason was false, *and* that discrimination was the real reason."  Hicks, 509 U.S. at 515.

Generally, an employee establishes a prima facie case of racial discrimination when she shows that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected group, or treated differently than similarly situated white employees. White v. Baxter Healthcare Corp., 533 F.3d 381, 392 (6th Cir. 2008).  However, where the adverse employment action takes place in the context of a reorganization or reduction in force,[5] where the employee's position is eliminated and not refilled, the fourth prong is modified because the employee is not actually replaced.  Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir.), cert denied, 498 U.S. 878 (1990).  Instead, the plaintiff must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  Id.  This evidence must be "sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [race]."  Id. at 1466.

---

[5] The United States Court of Appeals for the Sixth Circuit describes a reduction in force as follows:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.  An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.  However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

The Court notes that the instant case may not be the typical reduction in force case, as this particular reorganization occurred as a result of an adverse employment action that was undertaken for reasons specific to a particular employee (Plaintiff).  However, as it is undisputed that Plaintiff was not replaced by anyone,[6] the Court believes that the same modified fourth prong should apply here; otherwise Plaintiff would be foreclosed from the opportunity of presenting a prima facie case.  See Barnes, 896 F.2d at 1465 n.9 ("We have stated that McDonnell Douglas test is not to be applied mechanically, instead opting for a case-by-case approach that focuses on whether [race] was in fact a determining factor in the employment decision."); McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

The Court turns then to the question of whether Plaintiff has set forth sufficient direct, circumstantial, and/or statistical evidence to establish a prima facie case.  Neither party articulated or expressly addressed this alternative fourth prong in their respective briefs.  However, it appears that Plaintiff attempts to put forth additional evidence of discrimination in her discussion of pretext.  The Court addresses that evidence now in determining whether Plaintiff has shown additional evidence tending to indicate that Defendant singled out Plaintiff for discharge for impermissible reasons.

Plaintiff alleges that one Caucasian WKU employee, Debbie Richardson, was similarly situated to Plaintiff and was treated more favorable than Plaintiff was.  (Pl.'s Resp. [DN 75] 15–

---

[6] Plaintiff admits that she was not replaced by anyone.  (Pl.'s Resp. [DN 75] 11.)  The statements in her brief regarding subsequent alleged salary redistribution and a white part-time employee who became full-time some undisclosed time after Plaintiff's employment was terminated are not relevant to determining whether she was replaced.  See Barnes, 896 F.2d at 1465.  The undisputed record reflects that Plaintiff's duties were "redistributed among other existing employees already performing related work."  Thus, Plaintiff was not replaced by anyone, and Plaintiff's arguments to the contrary fail.

16.)  A plaintiff can satisfy the fourth prong where she demonstrates that a similarly situated employee who is not a member of the protected class was treated better.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998).  Specifically, Plaintiff contends that she "was treated differently than other employees because she was not allowed to stay in her position until another position was found for her as were similarly-situated, Caucasian employees such as Debbie Richardson."  (Pl.'s Resp. [DN 75] 16.)  The Court finds that Debbie Richardson was not similarly situated to Plaintiff and that even if she were, Richardson did not receive better treatment than Plaintiff did.

Plaintiff claims that Debbie Richardson, a white female, is a comparator because both Plaintiff and Richardson worked in HR at the time their positions were eliminated and both reported to Glisson.  The Sixth Circuit explained in Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992), that "to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*."  Id. at 583.  In Ercegovich, the Sixth Circuit further stated that "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'"  154 F.3d at 352.

The co-worker to which Plaintiff compares herself has similarities in some respects, but not in "all of the relevant aspects."  Richardson and Plaintiff were not similarly situated in terms of their jobs: Richardson was an office associate with duties akin to that of a secretary, (see Richardson Dep. [DN 54] 5:22–6:4, 8:1–:2), whereas Plaintiff was a manager with employees reporting to her.  The decision to eliminate Richardson's position was made by Mead, whereas

the decision to eliminate Plaintiff's position was made by Glisson, with Mead's approval. Importantly, Plaintiff has presented no evidence that Richardson's position was eliminated for any reason other than budget cuts, whereas it is clear from the record that Plaintiff's position was eliminated as a result of Plaintiff's performance issues and her personality conflict with Glisson. Accordingly, the Court finds that Plaintiff has failed to show that she and Debbie Richardson are similarly situated in all relevant aspects.

Even if Plaintiff could establish that Richardson was a comparable, Plaintiff is unable to establish that Richardson received better treatment.  Plaintiff's assertion that Richardson was "allowed to stay in her position until another position was found for her" is a mischaracterization of the facts.  First, Richardson was not simply allowed to remain in her position.  Richardson received notice in May 2008 that her position was to be eliminated effective June 30, 2008, the end of the fiscal year.  (Richardson Dep. [DN 54] 6:6–:18.)  However, upon Richardson's husband losing his job the following month, Mead granted Richardson's request for an extension until the end of August 2008.  (Id. at 6:19–:25.)  Thus, Richardson remained working in the HR department until the end of August, and started her new position at that time.  Plaintiff, by contrast, received notice on April 19, 2010 that her position was to be eliminated effective April 30, 2010, and that her salary and benefits would be continued through June 2010.  Plaintiff was also granted an extension, and she received her salary and benefits until July 30, 2010.  Unlike Richardson, who continued to work until she started her new job, Plaintiff was effectively on paid leave.

Second, no one at WKU "found Richardson a position."  Richardson testified that no one helped her find a job.  (Id. at 7:16–:17.)  She testified that she "went through the same process everybody else does," (id. at 13:6–:9), filling out applications and going on approximately eight

to ten interviews, both on and off campus, before ultimately accepting an offer for another position at WKU, (id. at 11:23–12:10, 13:3–:9). Plaintiff, by contrast, testified that she received help from Chief Diversity Officer Richard Miller in identifying at least one available employment opportunity on campus. Plaintiff declined to apply for that position because she refused to take a pay cut. Moreover, Plaintiff did not apply for any other position with WKU following the elimination of her position, despite being eligible for rehire. Thus, the Court finds that Plaintiff has failed to demonstrate that a comparable non-protected individual received better treatment.

"Alternatively, a plaintiff could show that the employer made statements indicative of a discriminatory motive" to establish a prima facie case. Barnes, 896 F.2d at 1466 (citing Laugesen v. Anaconda Co., 510 F.2d 307, 313 (6th Cir. 1975)); Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025 (6th Cir.) ("[Race]-related comments referring directly to the worker may support an inference of [race] discrimination."), cert denied 510 U.S. 861 (1993). While Plaintiff asserts with respect to her hostile work environment claim that Glisson made statements that involved race, which the Court addresses more thoroughly in its discussion of that claim, Plaintiff does not allege that any of these remarks were made in the context of the challenged decision to terminate her. Courts in discrimination cases often hold that stray remarks made outside the context of the challenged decision are minimally probative of discrimination. See Phelps, 986 F.2d at 1026 (finding that a decisionmaker's statement made one year prior to the termination decision about the plaintiff's birthday was "too ambiguous to establish the necessary inference of age discrimination" and was made "too long before the layoff to have influenced the termination decision"). The Court finds that these comments are not "sufficiently probative to

allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of" race. Barnes, 896 F.2d at 1466.

Plaintiff mentions in passing WKU's allegedly "every changing rationale" for Plaintiff's termination—"department restructuring, job elimination due to budgetary issues, or performance based." (See Pl.'s Resp. [DN 75] 11.) Although Plaintiff does not assert this as circumstantial evidence of discrimination, the Court notes that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext."[7] See Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir. 1996). Plaintiff appears to make this claim based on President Ransdell's testimony that he was not informed that Plaintiff's elimination was based on performance issues. (See Ransdell Dep. [DN 71] 12:22–13:16.) However, Plaintiff presents no actual evidence, and the Court finds none in the record, that Defendant's legitimate nondiscriminatory reasons for terminating her position given to her on April 19, 2010, have changed. (See Lewis-Smith Dep. Exs. 38 & 39 [DN 47] 235–39.) As Plaintiff offered no other evidence tending to indicate that Defendant singled her out for discharge for impermissible reasons, the Court concludes that Plaintiff has failed to establish a prima facie case of racial discrimination.

Even if the Court assumes Plaintiff made out a prima facie case, Defendant has put forth legitimate nondiscriminatory reasons for her termination: performance issues and the personality conflict with Glisson. See Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 413 (6th Cir. 2008) (noting that a personality conflict is a legitimate, nondiscriminatory reason for terminating an employee); Rose-Maston v. NME Hosps. Inc., 133 F.3d 1104, 1109 (8th Cir.

---

[7] The Court notes that although it is still in the prima facie case analysis, whether an employer's proffered legitimate nondiscriminatory reasons are false (pretext) can support an inference that the real reason the employer took the adverse employment action was discrimination. Thus, the Court addresses this as potential circumstantial evidence of discrimination.

1998) ("Title VII prohibits intentional discrimination based on certain, discreet classifications; it does not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices.").  The burden then shifts to Plaintiff to prove by a preponderance of the evidence that those reasons were a pretext for intentional racial discrimination.  Plaintiff has failed to demonstrate that Defendant's proffered reasons had no basis in fact, did not actually motivate Defendant's challenged conduct, or were insufficient to motivate Defendant's challenged conduct.  See Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 268 (6th Cir. 2010).  The Court concludes that Plaintiff has not shown Defendant's proffered reason for terminating her was pretext for racial discrimination.  Accordingly, Defendant is entitled to summary judgment as to this claim.

### B. Hostile Work Environment Harassment

Plaintiff also alleges that she was harassed because of her race in violation of Title VII and the KCRA.  As stated, Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  A plaintiff may establish a Title VII violation by proving that the discrimination based on race created a hostile work environment.  Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993); Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999) (amended opinion).  To establish a prima facie case of Title VII harassment, Plaintiff must prove that: (1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on race; (4) the harassment created a hostile work environment; and (5) the existence of employer liability.  Russell v. Univ. of Toledo, 537 F.3d 596, 608 (6th Cir. 2008); Hafford, 183 F.3d at 512.

Defendant asserts that Plaintiff cannot establish a prima facie case of racial harassment. The parties do not dispute that the first element is met, but Defendant contends that Plaintiff offers no proof as to the second and third elements—that she was subject to unwelcome harassment and that any alleged harassment was because of her race.  As to the fourth element, Defendant maintains that Plaintiff cannot show that the incidents cited were both objectively and subjectively hostile.

### 1.   Harassment Because of Race

Plaintiff's harassment case consists mainly of a conglomeration of incidents that are racially neutral.  The crux of Plaintiff's claim of a hostile work environment was that after her initial salary complaint in 2004, Glisson seemed dismissive of her comments or concerns, that he did not value her contributions, that he was rude to her, and that he slammed his door on her. (Lewis-Smith Dep. [DN47] 109:18–:110:12, 112:1–:11, 185:20–186:10, 201:6–:25, 218:23–219:10, 233:17–234:6.)  Title VII does not prohibit all verbal or physical harassment in the workplace but is directed at discrimination *because of* race.  In Title VII actions, "it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.'"  Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1988)).  Thus, conduct is not illegal just because it is uncomfortable, or inappropriate.

The Court notes that there is no suggestion, other than Plaintiff's global allegation, that much of the conduct or comments complained of involved race.  Plaintiff offers no proof that the closed-door meetings in Glisson's office where Glisson allegedly "blew up at" Plaintiff had a racial subtext.  A racial nexus is also missing from Plaintiff's allegation regarding the removal of her name from the EPAF routing of Patty Booth's pay raise in 2009.  Nor is there any racial

component to the hostile manner in which Glisson allegedly treated Plaintiff.  Slamming his door on her, being rude to her, not valuing her contributions, and being dismissive of her comments and concerns may have been rude, uncomfortable, or inappropriate, but it is not indicative of racial hostility towards African Americans.  This alleged harassment is more indicative of a personality conflict than of racial animus.  See Crawford v. Medina Gen. Hosp., 96 F.3d 830, 836 (6th Cir. 1996) (holding that the plaintiff's evidence of hostility and abusiveness in the workplace was not related to age-based animus but rather to a "simple clash of personalities").  Thus, while Plaintiff recites various perceived slights and abuses, many of the alleged harassing incidents cannot be considered in the hostile work environment analysis because Plaintiff has not shown that the alleged harassment was based upon her race.

## 2.  Hostile Work Environment

Plaintiff also describes a number of other statements, which, while referring to race, were not so severe or pervasive that they created an intolerable work environment.  Plaintiff testified that during President Barack Obama's campaign and election, HR co-workers made comments during staff meetings: "[T]hey just didn't like the fact that he was in office or what he represented and there were aside – no one, of course, was just going to outwardly say, but the comments were very inappropriate or very uncomfortable from the standpoint of things that happened in the African-American community."  (Lewis-Smith Dep. [DN 47] 139:11–140:4.)  Plaintiff testified that when President Obama was elected, she "was subject to the fact that nobody wanted to respect the presidency, and that [Obama] had become the president because the underlying tone was because of his race."  (Id. at 133:15–:18.)  Plaintiff also mentioned in her deposition some comments made by a co-worker about black students allegedly involved in a shooting on campus.  (See id. at 140:4–:18.)

Plaintiff claims that Glisson would refer to applicants and/or employees according to their race.  Plaintiff testified that during a staff meeting Glisson made the comment "Well, we hired a black man," when Dr. Richard Miller was hired in 2006 as WKU's Chief Diversity Officer, to which Plaintiff responded "Why did it have to be a black man?  Why did you not just refer—that he—that we hired an applicant?"  (Lewis-Smith Dep. [DN 47] 132:14–133:19.)  Glisson testified that he did make such a statement to his staff, as it was something that he was proud of and wanted to make sure that when Dr. Miller showed up in the office, people knew who he was.  (Glisson Dep. [DN 48] 49:23–50:6.)  Glisson testified further that he wanted Dr. Miller to be treated well and welcomed, which is the reason he shared that it was very positive that WKU hired an African-American leader at that level.  (Id. at 50:12–:17.)

Plaintiff claims that Glisson made statements to her that were "demeaning and embarrassing regarding African-American culture."  (Lewis-Smith Aff. [DN 75-1] ¶ 6; see Lewis-Smith Dep. [DN 47] 132:19–133:15.)   Specifically, Plaintiff testified to two alleged incidents.  According to Plaintiff, Glisson asked Plaintiff "why we do certain things in the black church as far as funerals or repass, or he didn't understand certain things or cultural difference there."  (Id. at 132:21–:25.)  Glisson admitted in his deposition that he did not understand and was not familiar with African-American funerals, and that when several of the staff attended the funeral of an African-American colleague—the first one that Glisson had attended—it was possible that he had inquired to Plaintiff regarding traditions ("what to expect . . . when to show up, how to show up, where to sit and those kind of things") so that "we would be respectful and we would be appropriate for the situation."  (Glisson Dep. [DN 48] 46:15–48:19.)  The second alleged incident relayed by Plaintiff involved a discussion of pantyhose:

> Even down to the fact where – why did I wear pantyhose?  I was – where did I
> wear pantyhose?  I said – well, you know, I said culturally black women in the

past had not – we don't shave our legs.  You know, again, maybe now that's a trend from a standpoint, but culturally speaking, you know, it's – our hair has a coarse situation from the standpoint – I was always told growing up, culturally, "Black women don't shave their legs."  Okay?  And he said, "Well, I would think that would be real hot.  I don't – I don't understand that.  My wife doesn't even wear pantyhose."

(Lewis-Smith Dep. [DN 47] 132:25–133:10.)   Glisson denied the entirety of this alleged discussion.  (See Glisson Dep. [DN 48] 45:21–46:14.)

The Court finds that these incidents do not constitute severe or pervasive conduct such as to create an objectively hostile working environment.  Racial harassment creates a hostile work environment when, based on a totality of the circumstances, "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris, 510 U.S. at 21 (citations omitted) (internal quotation marks omitted).  The test for a hostile work environment has both objective and subjective components.  Williams v. Gen. Motors Corp., 187 F.3d 553, 560–61 (6th Cir. 1999).  The conduct must be sufficiently severe or pervasive to alter the terms and conditions of employment in the mind of the victim and from the perspective of a reasonable person in the victim's position.  See Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2006) (citing Harris, 510 U.S. at 21–22).  As the Supreme Court noted in Harris:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Harris, 510 U.S. at 21–22.

The Court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work

23

environment.   Appropriate factors for the Court to consider "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.  Unless the harassment is quite severe, a single incident or isolated incidents of offensive racial conduct or remarks generally do not create an abusive working environment.  See Faragher, 524 U.S. at 788  (internal citation omitted) ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

Plaintiff describes only a handful of incidents with Glisson and co-workers during the six-year time period at issue.  While some of the comments may have been inappropriate or made Plaintiff feel uncomfortable, Plaintiff fails to show that these isolated incidents and offhand comments were severe or extremely serious.  These statements were not physically threatening or intimidating.  Instead, these interactions were at most "mere offensive utterances."  Plaintiff testified that many of Glisson's remarks were "as if he was disassociated with understanding cultural things as far as race" and that she "would address these things with him," telling him things like "'You might want to be mindful in saying that.'"  (Lewis-Smith Dep. [DN 47] 133:11–:15.)  Plaintiff testified that she never complained to anyone about any of those occasional remarks, but instead talked to Glisson directly because she "wanted him to do well" and "respected Tony in the regard – in regard to making sure that we were doing the right thing and that what was said was inappropriate."  (Id. at 135:20–136:15.)  "[A] lack of racial sensitivity does not, alone, amount to actionable harassment."  Faragher, 524 U.S. at 787 (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349 & nn.36–37 (3d ed. 1996)).  Additionally, her co-workers' alleged lack of respect for the presidency when

Obama was elected and an alleged comment made by an undisclosed co-worker regarding the race of students allegedly involved in a shooting on campus does not suggest discrimination toward or harassment of Plaintiff herself.  See Barrett v. Whirlpool Corp., 556 F.3d 502, 518 (6th Cir. 2009) (finding that several employees' use of the word "nigger" at work, while offensive, did not suggest discrimination toward or harassment of plaintiff herself).   The incidents understandably may have been inappropriate and offensive to Plaintiff, but they did not unreasonably interfere with Plaintiff's work performance or create an abusive working environment.

The Court concludes that Glisson's conduct was not "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive."  Harris, 510 U.S. at 21.  Thus, Plaintiff has failed to establish a prima facie case of racial harassment based on a hostile work environment. Accordingly, Defendant is entitled to summary judgment as to that claim.

## C. Retaliation under Title VII and the KCRA

Plaintiff next asserts that Defendant terminated her in retaliation for her reporting discriminatory treatment, in violation of Title VII, 42 U.S.C. § 2000e–3(a), and the KCRA, KRS 344.280(1).  Retaliation claims under the KCRA are evaluated under the same standard used to evaluate federal Title VII claims.  Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 504 (6th Cir. 2014).  Title VII makes it unlawful to retaliate against an employee "because [she] has opposed any practice made an unlawful employment practice by [Title VII], or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."   42 U.S.C. § 2000e–3(a).   When a plaintiff presents only circumstantial evidence, as in this case, Title VII retaliation claims are examined under the

McDonnell Douglas evidentiary framework.  Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 544 (6th Cir. 2008).

The plaintiff has the initial burden under McDonnell Douglas to establish a prima facie case of Title VII retaliation by showing: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.[8]  Russell v. Univ. of Toledo, 537 F.3d 596, 609 (6th Cir. 2008) (quoting Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000)).  The burden of establishing a prima facie case is not an onerous one. See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

If the plaintiff makes the prima facie case, "[t]he burden then shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for its actions."  Imwalle, 515 F.3d at 544.  If the defendant articulates such a reason, "the plaintiff must prove not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation."  Id.

The parties do not dispute that Defendant took an adverse employment action against Plaintiff when it eliminated her position and terminated her employment.  Defendant contends

---

[8] Plaintiff does not include the second element (employer knowledge) in her articulation of the prima facie case of a retaliation claim.  Instead, she articulates in her brief the elements of a retaliation claim under Title VII as "(1) that he engaged in activity protected by Title VII; (2) that he was the subject of adverse employment action; (3) there exists a causal link between the protective activity and the adverse action of the employer.'"  (Pl.'s Resp. [DN 75] 29–30 (citing White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 796 (6th Cir. 2004) (en banc)).)  The Sixth Circuit has noted that "[i]n the Sixth Circuit, many cases list 'employer knowledge' as the second element of the prima facie case," yet in White, "the court did not list knowledge as an independent element of a prima facie case." Scott v. Eastman Chem. Co., 275 F. App'x 466, 482 (6th Cir. 2008).  The court went on to state that "[r]egardless of whether employer knowledge is a stand-alone element of a prima facie case of retaliation, it is fairly clear from Sixth Circuit case law that employer knowledge of a plaintiff's protected activity is required.  Id.  To prove a causal connection, a plaintiff must establish that the decisionmakers involved in the adverse employment action "at issue had knowledge of the protected activity, as one cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so."  Id.

Plaintiff has failed to establish the remaining three elements, specifically: that she engaged in a protected activity; that Glisson knew of any such protected activity; and that there is a causal connection between the two.   Further, Defendant argues that even if Plaintiff was able to establish a prima facie case, it has produced legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff is unable to establish that those reasons were pretext for intentional retaliation.

### 1.   Protected Activity

The parties dispute whether Plaintiff engaged in any protected activity prior to her termination.   Plaintiff contends that Defendant retaliated against her because of her alleged December 2009 report of racial discrimination and a hostile work environment.   Additionally, it appears that Plaintiff asserts that Defendant retaliated against her because she engaged in protective activity on behalf of others.   The Court will address Plaintiff's alleged protected activity on her own behalf first.

### i.   Protected Activity on Behalf of Herself

Defendant asserts that Plaintiff never made any complaint of discrimination or a hostile work environment.   Instead, Defendant argues, the substance of the issues raised by Plaintiff related to what Plaintiff perceived as unfair treatment, not racial discrimination.   As unethical treatment does not give rise to a cause of action under Title VII, see Speck v. City of Memphis, 370 F. App'x 622, 626 (6th Cir. 2010), Defendant asserts that Plaintiff failed to identify evidence in the record that she engaged in any kind of protected activity.   Plaintiff counters that her reports in December 2009 were protected activity.   In her brief, Plaintiff alleges that in December 2009 she "complained regarding the conditions of her employment stating that she was excluded[,]

that her pay was not equivalent to her white co-workers[,] and that Tony Glisson acted in a hostile manner towards her."  (Pl.'s Resp. [DN 75] 21.)

The alleged report was not made in connection with or anticipation of any EEOC charge, as required under the "participation" clause.  See Abbott v. Crown Motor Co., 348 F.3d 537, 543 (6th Cir. 2003).  Therefore, to constitute Title VII protected activity, Plaintiff's report would have to fit within the "opposition" clause.  The opposition clause prohibits adverse action against an individual "because [she] has opposed any practice made an unlawful employment practice by" Title VII.  To constitute "opposition," for purposes of protected activity under § 2000e–3(a), "a plaintiff must engage in a discrete, identifiable, and purposive act of opposition *to discrimination*."  Thompson v. N. Am. Stainless, LP, 567 F.3d 804, 816 (6th Cir. 2009) (en banc) (emphasis added), rev'd on other grounds, 562 U.S. 170 (2011).  Although a finding of unlawful retaliatory discharge is not dependent on the merits of the underlying claim, Johnson v. University of Cincinnati, 215 F.3d 561, 579–80 (6th Cir. 2000), in order to claim protection under the opposition clause, the plaintiff must demonstrate that she had "a reasonable and good faith belief that the opposed practices were unlawful," id. at 579 (quoting EEOC Compliance Manual (CCH) ¶ 8006).

It is undisputed that Plaintiff complained to Melky and Wilkins, and separately to both Mead and Glisson, that she was excluded from the EPAF routing of Patty Booth's July 2009 pay raise.  Plaintiff testified that she interpreted this exclusion as unethical and as discrimination against her.  (Lewis-Smith Dep. [DN 47] 286–88.)  It is also undisputed that Plaintiff did not make a formal (or informal) complaint of racial discrimination or hostile work environment discrimination in violation of Title VII.  (Id. at 294:4–295:16).  However, the Sixth Circuit has "repeatedly held that complaints to human resources personnel regarding potential violations of

Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation." Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc., 495 F. App'x 651, 655 (6th Cir. 2012). In Trujillo, the plaintiff complained to a human resources officer about several racist remarks made by a member of management during a business trip. The plaintiff was fired a week later. Id. The court concluded that the plaintiff had engaged in protected opposition. The racist remarks "themselves [were] the unlawful employment practice" the plaintiff was opposing "to the extent that they create[d] a hostile work environment." Id. The court found that the fact that it was an "informal conversation" "d[id] not change the nature and purpose of the conversation, which was a 'discrete, identifiable, and purposive' opposition to racially-oriented language." Id. (quoting Thompson, 567 F.3d at 816).

However, the Sixth Circuit has also "found that some complaints to human resources personnel are not sufficiently specific to constitute opposition to employment discrimination." Id. (citing Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313–14 (6th Cir. 1989)). In Booker, the court held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." 879 F.2d at 1313. Additionally, the court found that the gravamen of the plaintiff's letter to human resources was a complaint about management practices, rather than one of racial discrimination. Id. ("An examination of the letter indicates that it is not in opposition to a violation of the Act. Booker was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer.").

The record reflects that the substance of Plaintiff's communications to Melky and to Mead did not relate to race discrimination. The incidents cited by Plaintiff—that she, a manager, was not included in non-manager employees stuffing envelopes and that Glisson removed

Plaintiff from an EPAF routing regarding Patty Booth's raise—do not include any allegation that these occurred because of Plaintiff's race.  (See Melky Dep. Ex. 2 [DN 49] 130.)  The case here appears analogous to Booker, as Plaintiff made a vague charge of "discrimination" in her December 2009 report based on unfair treatment, not a specific charge of discrimination *based on her race*.  See Speck, 370 F. App'x at 626; Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs, 47 F.3d 1068, 1075 (11th Cir. 1995) ("Title VII is designed to protect employees against discrimination based on race, sex, or national origin; it is not designed to protect against any and all unfair treatment in the workplace.").  Moreover, unlike the racial remarks complained of in Trujillo, Plaintiff was not contesting any unlawful employment practice when she complained that she was excluded from the EPAF routing of Patty Booth's raise.

However, Plaintiff testified in her affidavit that she told Wilkins during the meeting with Melky that she felt racially discriminated against and that she was working in a hostile work environment, (Lewis-Smith Aff. [DN 75-1] ¶ 20), and that she confided in Mead her feelings of racial discrimination and hostile work environment, (id. ¶ 23).  Plaintiff points to the handwritten document that notes: "Discrimination based on race.  Hostile environment→wouldn't let her stuff envelopes.  Says TLG has gone over her head and approved EPAFs." as evidence that she engaged in protected activity.  The Court notes that there is conflicting evidence in the record, including conflicting testimony by the Plaintiff in her deposition during discovery and her affidavit filed with her response brief, as to whether Plaintiff actually reported racial discrimination and a hostile work environment at this time, either to Melky and Wilkins or to Mead.  As this is a motion for summary judgment, the Court acknowledges that it must view all evidence in the light most favorable to Plaintiff and draw all inferences in favor of Plaintiff.  The Court need not decide whether Plaintiff engaged in protected activity, however, because even

assuming that the report meets the requisite threshold, Plaintiff is unable to establish the remaining elements of the prima facie case.

### ii.  Protected Activity on Behalf of Others

Plaintiff appears to claim in a discussion section header that she engaged in protective activity on behalf of others for which she received retaliation and hostile treatment.  (See Pl.'s Resp. [DN 75] 22.)  Within that section, Plaintiff lists various other employees' grievances against Defendant, and her alleged involvement with those grievances, if any.  Implicit in Plaintiff's response is that she is entitled to special protection because she had knowledge of numerous personnel issues and complaints by others by virtue of her position in the HR Department and as a member of Staff Council.  Rejecting this type of argument, one court reasoned:

> Adopting plaintiff's position would render practically all of her work activities and work product subject to Title VII protection.  Other courts that have addressed this issue of dealing with employees in human resources positions have found that an "employee does not receive special protection under Title VII simply because the employee handles discrimination complaints."  Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1082 (9th Cir. 1996).  Courts have acknowledged the difficult situation of reconciling the language of Title VII with the dismissal of an employee who handles discrimination complaints.  Id.  "The position was unique in that it required the occupant to act on behalf of its employer in an area where normally action against the employer and on behalf of the employees is protected activities."  Id. (quoting Smith v. Singer Co., 650 F.2d 214, 217 (9th Cir. 1981)).
>
> In order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment.  See McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486–87 (10th Cir. 1996).  In a case dealing with alleged retaliation under the Fair Labor Standards Act, the Tenth Circuit held that a personnel director did not engage in protected activity when she advised her employer that its wage and hour policies were in violation of the FLSA.  Id. at 1481. . . .  Thus, a plaintiff who has not opposed any action of the employer or assisted an employee with the filing of a grievance with an outside agency cannot retroactively use her position to assert protected activity.  See Matta v. Snow, No. 02–cv–862, 2005 WL 3454334, at *25 (D.D.C. Dec. 16, 2005) ("Plaintiff— having failed to identify any specific oppositional activity in which he was

engaged—cannot rely upon his position as an EEO Counselor alone to provide the *prima facie* basis for his opposition claim.”).

Correa v. Mana Prods., Inc., 550 F. Supp. 2d 319, 330–31 (E.D.N.Y. 2008).   In this case, Plaintiff has not shown that she engaged in protected activities with regard to other persons’ grievances beyond her regular job duties at WKU.   In fact, Plaintiff states in her brief that as part of her job description in HR, “she was required to report to management and bring to their attention any employee issues and concerns,” and that she “did what the job required” and brought the issues and EEO concerns to management.   (Pl.’s Resp. [DN 75] 2.)   Thus, the Court finds that Plaintiff has failed to establish that she engaged in protected activity on behalf of others.

### 2. Employer Knowledge

Defendant argues that Plaintiff did not and cannot point to any evidence in the record that Glisson knew of any protected activity when he decided to eliminate her position.   As noted, Plaintiff did not directly address the element of employer knowledge in her brief.   However, as discussed, regardless of whether employer knowledge is a stand-alone element or part of the causation element, the Sixth Circuit has always required employer knowledge of a plaintiff’s protected activity.   See Scott v. Eastman Chem. Co., 275 F. App’x 466, 482 (6th Cir. 2008).   An employee may survive summary judgment by producing either direct or circumstantial evidence to establish this element of her claim.   Proffitt v. Metro. Gov’t of Nashville & Davidson Cnty., Tenn., 150 F. App’x 439, 442–43 (6th Cir. 2005).   “Where the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than ‘offer[] only conspiratorial theories . . . or flights of fancy, speculations, hunches, intuitions, or rumors.’” Id. at 443 (quoting Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002)) (internal quotation marks omitted).

Here, Glisson and Mead were the decisionmakers who eliminated Plaintiff's position and terminated her employment.  As Plaintiff's direct supervisor, Glisson made the recommendation to terminate Plaintiff to his boss, Mead, who then approved Glisson's recommendation.  Glisson testified that he was not aware of any complaint of racial discrimination, only that she had sought a pay adjustment in December 2009 and had expressed concern that she was removed from the EPAF routing.  (Glisson Dep. [DN 48] 66:10–:14, 169:22–170:11.)  Glisson's e-mail to himself (characterized as "notes to file") on December 10, 2009, noting that Plaintiff had informed him that she had spoken with Mead regarding her salary complaint and containing no indication of a complaint regarding racial discrimination or a hostile work environment, corroborates his testimony.  (Id. Ex. 28, at 253.)

Plaintiff fails to produce evidence, direct or circumstantial, of Glisson's knowledge in rebuttal.  Instead, Plaintiff merely relies on speculation, based on the undisputed fact that Glisson's position at WKU is head of the HR department, for her conclusory allegation that Glisson's sworn testimony on this point is unworthy of belief.  (See Pl.'s Resp. [DN 75] 12, 16.)  This speculation and conclusory statement is insufficient to meet her burden on this second element.  See Proffitt, 150 F. App'x at 443; Harstel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996) (conclusory statements, subjective beliefs, or intuition cannot defeat summary judgment).  Likewise, Plaintiff's claim in her brief that Glisson "blew up at her" for going over his head does not support an inference that Glisson knew of any alleged protected activity.  Plaintiff testified that she did not know if Melky spoke to Glisson about the "concerns" Plaintiff spoke to Melky about.  (Lewis-Smith Dep. [DN 47] 302:16–:20.)  Additionally, and despite a conflicting statement in her affidavit and in her brief, when asked whether Glisson mentioned Melky in particular when he allegedly criticized Plaintiff for going over his head, Plaintiff testified that she

could not give an exact name.  (See id. at 302:21–303:1.)  Even viewing the evidence in the record in the light most favorable to Plaintiff, it only supports that Glisson knew about Plaintiff going to see Mead regarding her salary adjustment request.  Thus, the Court finds that Plaintiff has failed to present evidence, either direct or circumstantial, from which a factfinder could infer that Glisson knew of her protected activity when he terminated her.

As for Mead, it is unclear precisely what her knowledge was of Plaintiff's alleged protected activity.  Plaintiff alleges in her affidavit that she informed Mead of her feelings of racial discrimination and a hostile work environment.  Mead testified in her deposition that she understood Plaintiff's December 2009 "report" to Melky and Wilkins as a meeting with the EEO Director to discuss a circumstance, which Mead regarded as entirely different from a complaint. (See Mead Dep. [DN 65] 23:5–24:8.)  Mead denies that she was ever "informed that it had gone from a discussion to a formal complaint."  (Id. at 24:3–:4.)  Additionally, Mead testified that she did not receive any information from Melky or EEO regarding the alleged racial discrimination "reports."  (Id. at 27:8–:14.)   Melky testified that Mead was apprised and informed that Plaintiff's perception was that Glisson was discriminating against Plaintiff in her employment based upon race.  (Melky Dep. [DN 49] 32:4–:9.)  Taking the facts in the light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exists as to whether Mead had knowledge of Plaintiff's alleged protected activity when Mead approved Glisson's recommendation to terminate Plaintiff.

### 3.  Causal Connection

Defendant asserts that Plaintiff has failed to establish a causal connection between her termination and any alleged protected activity.  To establish the causal connection required in the fourth prong, the plaintiff must produce sufficient evidence "from which an inference could be

drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity.  Nguyen, 229 F.3d at 563; Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528, 2533 (2013).  Plaintiff argues that the temporal proximity between her alleged report on December 7, 2009 and her termination in April 2010 and Mead allegedly asking Plaintiff (sometime in "March-ish") if she had ever thought about applying to a job in another area, taken together, permit the inference that the adverse action would not have been taken had Plaintiff not made her alleged report.

In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, substantial case law from the Sixth Circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone. See Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th Cir. 2010) (collecting cases). However, the Sixth Circuit has accepted temporal proximity as a valid basis from which to draw an inference of retaliatory motivation under limited circumstances.  See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 524–25 (6th Cir. 2008).  Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement her claim with "other evidence of retaliatory conduct to establish causality."  Id.

Here, Plaintiff relies principally upon the timing of her termination, which occurred four months after Plaintiff's alleged protected activity.  This timing, without more, does not raise the inference that the adverse action would not have been taken had Plaintiff not engaged in the alleged protected activity.  See Cooper v. City of N. Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation.").  Contrary to Plaintiff's assertion, Plaintiff presents no other evidence of retaliatory conduct.  Plaintiff claims that Mead's

allegedly coming to Plaintiff sometime in March of 2010 and inquiring about whether she would consider employment elsewhere in the University or in Nashville supports "an inference that, from a causal standpoint it was the report of the racially hostile and discriminatory environment that resulted in the adverse employment action."  (Pl.'s Resp. [DN 75] 30.)  However, Plaintiff fails to establish that this alleged statement by Mead expresses any retaliatory animus or constitutes retaliatory conduct.  Even viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has not presented "other evidence of retaliatory conduct to establish causality."

Furthermore, even if the four months were enough to raise an inference of retaliation based on temporal proximity, the events that transpired in this case dispel any such inference. The Sixth Circuit "has previously held that 'an intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity.'" Kuhn v. Washtenaw Cnty., 709 F.3d 612, 628 (6th Cir. 2013) (quoting Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 472 (6th Cir. 2012) (holding that an oil rig worker who had complained about sexual harassment to his superiors, but who subsequently left his worksite without authorization, had engaged in an intervening event that gave his employer a legitimate reason to discipline him)); Vereecke, 609 F.3d at 401 (finding that an intervening "obviously nonretaliatory basis" for the adverse action is evidence negating temporal proximity).  Here, Plaintiff's insulting comments to Glisson a week before the decision to terminate her was made, coupled with the reports received by Glisson regarding Plaintiff's performance issues, as well as his own observations, constituted an intervening legitimate reason for Defendant to terminate her employment, and that reason dispels any inference of retaliation based on temporal proximity.

Thus, "[t]he absence of close temporal proximity and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive." Vereecke, 609 F.3d at 401.  As Plaintiff has not cited sufficient evidence of a causal link between her alleged protected activity and her termination, the Court finds that Plaintiff has not presented a prima facie case of Title VII retaliation.  Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### D. Violation of the KWA

Plaintiff also asserts a claim for violation of the Kentucky Whistleblower Act ("KWA"), KRS 61.101–.103, 61.990–.991.  The KWA protects public employees from retaliation when they disclose or report violations of law or mismanagement.  The KWA states in part:

> No employer shall subject to reprisal, or directly or indirectly use, or threaten to use, any official authority or influence, in any manner whatsoever, which tends to discourage, restrain, depress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the Kentucky Legislative Ethics Commission, the Attorney General, the Auditor of Public Accounts, the Executive Branch Ethics Commission, the General Assembly of the Commonwealth of Kentucky or any of its members or employees, the Legislative Research Commission or any of its committees, members or employees, the judiciary or any member or employee of the judiciary, any law enforcement agency or its employees, or any other appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety. No employer shall require any employee to give notice prior to making such a report, disclosure, or divulgence.

KRS 61.102(1).  The KWA's underlying purpose "is to protect employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information." Davidson v. Com., Dep't of Military Affairs, 152 S.W.3d 247, 255 (Ky. Ct. App. 2004).

Kentucky courts apply a burden-shifting analysis to claims arising under the KWA.  See Thorton v. Office of Fayette Cnty. Att'y, 292 S.W.3d 324, 329 (Ky. Ct. App. 2009).   To establish a prima facie case of a KWA violation, a plaintiff must prove that:

> (1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure.

Thornton, 292 S.W.3d at 329 (quoting Davidson, 152 S.W.3d at 251).  In addition, the plaintiff "must show by a preponderance of evidence that 'the disclosure was a contributing factor in the personnel action.'"  Davidson, 152 S.W.3d at 251 (quoting KRS 61.103(3)).  If the plaintiff meets this burden, the burden then shifts to the state employer "to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action."  Davidson, 152 S.W.3d at 251 (quoting KRS 61.103(3)) (internal quotation marks omitted).

It is undisputed that the employer in this case is an officer of the state and that Plaintiff was employed by the state.  Defendant argues Plaintiff is unable to establish the third element: that she made or attempted to make a good faith report or disclosure of a suspected violation of law to an appropriate body or authority.  Further, Defendant contends that Plaintiff has not shown by a preponderance of the evidence that any alleged disclosure was a contributing factor in the personnel action against her.

The Court finds that Plaintiff has failed to establish that she made a disclosure of the type the statute was designed to protect.  For purposes of a whistleblower action, "disclosure" means "a person acting on his own behalf, or on behalf of another, who reported or is about to report, either verbally or in writing, any matter set forth in KRS 61.102."  KRS 61.103(1)(a).  Plaintiff does not dispute Defendant's assertion that she failed to make or to attempt to make a good faith

report to EEO or Melky regarding alleged racial discrimination.  Thus, any alleged complaint regarding alleged racial discrimination made by Plaintiff is not a protected disclosure under the KWA.  Plaintiff asserts, however, that she "did much more than make a report," and goes on to list a number of occurrences, (see Pl.'s Resp. [DN 75] 31–32), which the Court assumes Plaintiff is alleging are protected disclosures.  The Court will address each one in turn.

Plaintiff asserts first that "[s]he testified in Zhang v. WKU, contrary to WKY's interest – and was subsequently terminated."  (Id.)  Plaintiff gave deposition testimony in the Zhang case in February 2009,[9] the transcript of which Plaintiff attached to her response brief.  However, Plaintiff has failed to offer specific facts, or citations to specific portions of that testimony or the record, to demonstrate that she disclosed in that testimony any violation or suspected violation of the law.  Moreover, on the Court's independent review of the deposition (which was not disclosed in discovery by Plaintiff), the Court finds that Plaintiff neither made any complaint regarding Zhang's treatment nor made a report of any wrongdoing relating to Zhang.  Thus, the Court concludes that Plaintiff made no disclosures of any matter set forth in KRS 61.102.

Plaintiff also mentions that she "took in the ADA claim for [Marilyn] Gardner and participated in the mediation, and then the ADA responsibilities were taken away from her." (Pl.'s Resp. [DN 75] 32.)  However, Plaintiff makes no suggestion that she made any KWA disclosure.  The Kentucky Supreme Court has stated that KRS 61.102 is "similar in almost every respect" to the federal Whistleblower Protection Act of 1989 ("WPA"), Commonwealth Department of Agriculture v. Vinson, 30 S.W.3d 162, 169 (Ky. 2000), thus Kentucky courts look to federal precedent for guidance.  Davidson, 152 S.W.3d at 255.  In Willis v. Department of Agriculture, 141 F.3d 1139 (Fed. Cir. 1996), the court stressed that "the WPA is intended to

---

[9] Plaintiff testified in that case at trial sometime subsequent to her termination.  In that case, Zhang complained of pregnancy discrimination, and her claim was rejected by a jury and affirmed on appeal.  See Zhang v W. Ky. Univ., No. 2011-CA-000287-MR, 2012 WL 4464448 (Ky. Ct. App. Sept. 28, 2012).

protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel." Id. at 1144.  The court held that there was no protected disclosure under the WPA in that case because the alleged disclosure was no more than the employee carrying out his everyday job responsibilities.  Id.  Thus, the employee could not have been said "to have risked his personal job security by merely performing his required duties," which was "expected of all government employees pursuant to the fiduciary obligation which every employee owes to his employer." Id.  Similarly, part of Plaintiff's duties at the time as Manager of Employment and Training was to receive reasonable accommodation requests from employees.  Receiving Gardner's accommodation request and taking some notes at a mediation regarding that request were no more than Plaintiff carrying out her everyday job responsibilities.  As this was part of Plaintiff's job performance, in no way did it place her at personal risk for the benefit of the public good and thus cannot itself constitute a protected disclosure under the KWA.

Plaintiff additionally asserts that "[r]emoving [Plaintiff] from the routing of Patty Booth's pay increase after the department was told there was no additional money is fraudulent."  (Pl.'s Resp. [DN 75] 32.)  While Plaintiff was understandably displeased at being removed from the EPAF routing, doing so was within Glisson's authority and was not improper.  Thus, any report regarding the removal of Plaintiff from the routing of that pay increase is not a protected disclosure under the KWA.

Plaintiff also discusses her belief that WKU has a practice of handpicked search committees and pre-selection and that the practice is unethical and wrong.  Plaintiff mentions two examples, Liz Esters and Ingrid Woods.  While Plaintiff mentions earlier in her brief that she "was involved during her employment at WKU with finding the replacement for Ester[sic],"

Plaintiff does not allege that she reported or attempted to report any matter set forth in KRS 61.102. As for Woods, the undisputed record reflects that Plaintiff talked to Glisson on September 2, 2005, about what Plaintiff felt were "[WKU's] flawed search processes which involve alleged pre-selection and hand-picked search committees." (Glisson Dep. Ex. 1 [DN 48] 100.) Glisson responded to Plaintiff that "if [she] had concerns about the University's search processes she should, given her capacity, make those concerns known to Huda [Melky]." (Id.) Plaintiff makes no assertion that she made such a report to Melky, who was the authority with the power to remedy or report the perceived misconduct. Thus, the Court concludes that Plaintiff fails to establish that she made any protected report or disclosure under the KWA.

Even if, *arguendo*, Plaintiff had made any protected disclosures under the KWA, the Court finds that she has not shown by a preponderance of the evidence that the disclosure was a contributing factor in the personnel action. KRS 61.103 defines "contributing factor" as

> any factor which, alone or in connection with other factors, tends to affect in any way the outcome of a decision. It shall be presumed there existed a "contributing factor" if the official taking the action knew or had constructive knowledge of the disclosure and acted within a limited period of time so that a reasonable person would conclude the disclosure was a factor in the personnel action.

KRS 61.103(1)(b). The Court finds that none of the disclosures was within such a limited period of time so that a reasonable person could conclude that the disclosure was a factor in the personnel action. Accordingly, the Court finds that Defendant is entitled to summary judgment as to Plaintiff's whistleblower claim.

### E. Wrongful Discharge

Plaintiff additionally brought a claim for wrongful termination. However, in her Response brief to the Motion for Summary Judgment [DN 75], although not explicitly conceding to a grant of summary judgment on her wrongful discharge claim, Plaintiff wholly failed to address the claim, as well as Defendant's argument in favor of summary judgment as to that

claim.  When a party fails to respond to a motion or argument therein, the Sixth Circuit has held

that the lack of response is grounds for the district court to assume opposition to the motion is

waived and grant the motion.  Humphrey v. U.S. Att'y Gen.'s Office, 279 F. App'x 328, 331

(6th Cir. 2008).  Thus, it appears Plaintiff does not oppose Defendant's motion with respect to

Claim III of her Complaint, the substance of which is that "Defendant's actions, by and through

its agents, in terminating Plaintiff were without just cause and were in retaliation for the

Plaintiff's complaints pertaining to the Defendant's violation of law and safety violations, and

were in further violation of the Defendant's written policies, customs, and practices."  (Compl.

[DN 1] ¶ 36.)

In any event, Defendant has demonstrated that it is entitled to summary judgment on this

claim.  "Generally, in the absence of a specific contractual provision to the contrary, employment

in Kentucky is terminable at-will, meaning that an employer may ordinarily discharge an

employee 'for good cause, for no cause, or for a cause that some might view as morally

indefensible.'"  Miracle v. Bell Cnty. Emergency Med. Servs., 237 S.W.3d 555, 558 (Ky. Ct.

App. 2007) (quoting Firestone Textile Co. Div. v. Meadows, 666 S.W.2d 730, 731 (Ky. 1983)).

Additionally, there is a narrow common law exception to the employment-at-will doctrine, which

is based on public policy.  See Grzyb v. Evans, 700 S.W.2d 399, 401 (Ky. 1985).  The essential

elements to pleading a common law cause of action for wrongful discharge in violation of public

policy under Kentucky law are:

> 1) The discharge must be contrary to a fundamental and well-defined public
> policy as evidenced by existing law.
> 2) That policy must be evidenced by a constitutional or statutory provision.
> 3) The decision of whether the public policy asserted meets these criteria is a
> question of law for the court to decide, not a question of fact.

Grzyb, 700 S.W.2d at 401.  Defendant asserts that Plaintiff, through discovery, failed to identify

any evidence in support of her wrongful discharge claim or the applicability of any exception to

the at-will doctrine.   Thus, as a result, Plaintiff's employment was terminable at will.   As Plaintiff wholly failed to make a showing sufficient to establish the existence of the elements essential to her claim, on which she bears the burden of proof at trial, the Court concludes that her wrongful discharge claim fails and Defendant is entitled to summary judgment on that claim.

### F. Age Discrimination

Plaintiff also failed to respond to Defendant's argument in favor of summary judgment on her age discrimination claim under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1), and the KCRA, KRS 344.040(1)(a).   The Court believes this argument is waived.   See Humphrey, 279 F. App'x at 331.   Even if it is not waived, Defendant has demonstrated that it is entitled to summary judgment on this claim.

Both the ADEA and the KCRA prohibit an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); KRS 344.040(1)(a).[10]  A plaintiff may support a claim of age discrimination in employment by offering either direct or circumstantial evidence of discrimination.   Mitchell v. Vanderbilt Univ., 389 F.3d 177, 181 (6th Cir. 2004).   In this case, there is no direct evidence of age discrimination.   Absent such evidence, ADEA claims are analyzed under the McDonnell Douglas burden-shifting framework to determine whether a discrimination claim should be submitted to a jury based on circumstantial evidence.   See Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 547 (6th Cir. 2004).   In order to establish a prima facie case of age discrimination, a plaintiff must show (1) that she was a member of a protected age class; (2) that she was discharged; (3) that she was qualified for the position she held; and (4) that she was replaced by a younger worker.   Id.   Just as with Title VII claims, in

---

[10] Age discrimination claims brought under the KCRA are analyzed under the same standard as claims brought under the ADEA.   Allen v. Highlands Hosp. Corp., 545 F.3d 387, 393 (6th Cir. 2008); Williams v. Wal-Mart Stores, Inc., 184 S.W.3d 492, 495 (Ky. 2005).   Accordingly, the Court will analyze these claims simultaneously.

"reduction in force" cases, the fourth prong is modified so that the plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Id. (quoting Ercegovich, 154 F.3d at 350) (internal quotation marks omitted).

Plaintiff has failed to provide any direct or circumstantial evidence tending to indicate that Defendant singled her out for discharge because of her age.  As such, Plaintiff has failed to establish a prima facie case of age discrimination under the ADEA.  Accordingly, the Court finds that Defendant is entitled to summary judgment in its favor on Plaintiff's age discrimination claim.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Western Kentucky University's Motion for Summary Judgment [DN 55] is GRANTED.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

January 8, 2015

cc: counsel of record